# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GREGORY N. DUCKWORTH, F/V
REAPER, INC., and F/V TWISTER, INC.,

    Plaintiffs,

      v.

THE UNITED STATES OF AMERICA,
acting by and through GARY LOCKE, in his
official capacity as Secretary of the United
States Department of Commerce, THE
NATIONAL OCEANIC AND
ATMOSPHERIC ADMINISTRATION, and
THE NATIONAL MARINE FISHERIES
SERVICE,

    Defendants.

Civil Action No. 09–1387 (CKK)

## MEMORANDUM OPINION
(April 15, 2010)

Plaintiffs Gregory N. Duckworth, F/V Reaper, Inc., and F/V Twister, Inc. (collectively,

"Plaintiffs") bring this action against Defendants Gary Locke, in his official capacity as the

Secretary of the United States Department of Commerce, the National Oceanic and Atmospheric

Administration ("NOAA"), and the National Marine Fisheries Service ("NMFS")[1] (collectively,

"Defendants") seeking to appeal a final decision of the Secretary regarding Notices of Violation

and Assessment ("NOVAs") and Notices of Permit Sanction ("NOPSs") issued to Plaintiffs for

alleged violations of the Magnuson-Stevens Fisher Conservation and Management Act

("Magnuson-Stevens Act" or "MSA"), 16 U.S.C. §§ 1801-82.  An administrative law judge held

---

[1] The National Marine Fisheries Service is administratively part of the National Oceanic
and Atmospheric and Administration, which is housed within the U.S. Department of
Commerce.  The Court shall generally use the term "agency" to refer to any of these entities.

a hearing on the matter and issued an initial decision and order affirming the violations, which was modified in a final decision by the NOAA Administrator acting on behalf of the Secretary. Presently pending before the Court are the parties' cross-motions for summary judgment. In addition, Plaintiffs have recently filed a [28] Motion for a Temporary Restraining Order and Preliminary Injunction Seeking to Stay Judicial Decision-Making and to Stay Enforcement Proceedings pending further investigation into Defendants' alleged misconduct.[2] For the reasons explained below, the Court shall GRANT Defendants' [24] Motion for Summary Judgment, DENY Plaintiffs' [22] Motion for Summary Judgment, and DENY Plaintiffs' [28] Motion for a Temporary Restraining Order and Preliminary Injunction.

## I. BACKGROUND

Plaintiff Gregory Duckworth is a commercial fisherman who lives in Rhode Island. At the time of the events giving rise to the alleged violations at issue here, Duckworth was the sole owner of the fishing vessels Reaper and Twister, which he managed through wholly-owned corporations F/V Reaper, Inc., and F/V Twister, Inc., respectively. On August 2, 2007, NOAA issued Notices of Violation and Assessment and Notices of Permit Sanction against Plaintiffs alleging nine violations of the Magnuson-Stevens Act, eight of which are the subject of this appeal.[3] The first of the eight counts at issue pertains to a claim that Duckworth and F/V Twister, Inc. made a false statement in connection with a fishing permit application in violation of 50 C.F.R. § 648.14 (the "False Statement Case"). The remaining seven counts pertain to

---

[2] Plaintiffs earlier filed a [16] Motion for a Temporary Restraining Order and Preliminary Injunction, but that motion was withdrawn.

[3] The first count, which is not at issue in this action, was directed at F/V Reaper, Inc., and the Reaper's operator for failure to comply with certain "days at sea" call-in requirements.

allegations that Duckworth and F/V Reaper, Inc. unlawfully fished for lobster by leaving lobster traps at sea after their fishing permits were suspended due to a prior federal fisheries violation (the "Lobster Traps Case").

Plaintiffs requested an administrative hearing on the alleged violations, and a three-day hearing was commenced in Boston, Massachusetts, on May 6, 2008.  *See* Admin. Record ("AR") Ex. 58 (Initial Decision and Order) at 3.  During the hearing, Defendants presented testimony from eleven witnesses and introduced forty-nine exhibits; Plaintiffs offered testimony from four witnesses and introduced seventeen exhibits into evidence.  *See id.* at 3-4.  The case was heard by Administrative Law Judge ("ALJ") Michael Devine, who issued an Initial Decision and Order on October 6, 2008, finding that NOAA had established by a preponderance of reliable and credible evidence that Plaintiffs had violated federal fisheries laws and regulations by submitting a false statement in a permit application and by fishing for lobsters without a valid permit.  *See id.* at 4. On November 24, 2009, the NOAA Administrator issued an order affirming the violations but modifying the ALJ's initial decision regarding the sanctions and penalties imposed.  *See* AR Ex. 79 (Final Decision).  The final decision of the agency is to impose a $50,000 fine for both the False Statement Case and the Lobster Traps Case and to suspend Plaintiffs' operating and vessel permits for a period of 48 months.  *See id.*

The facts surrounding Plaintiffs' alleged violations are largely undisputed.  The facts described below are derived from the evidence presented at the administrative hearing, the administrative record, and the parties' submissions to this Court.

A.    *The False Statement Case*

Defendants issued a NOVA and NOPS against Plaintiffs Duckworth and F/V Twister,

Inc. for making a false statement in the process of applying for a permit by submitting an altered

"Certificate of Documentation" for the Twister. The deadline for Duckworth to renew his 2005

fishing permits for the Twister was May 1, 2006. Defs.' Stmt.[4] ¶ 1. In order to renew his fishing

permits, Duckworth was required to submit, *inter alia*, a "current copy of the vessel's current

USCG [U.S. Coast Guard] documentation." *See* 50 C.F.R. § 648.4(c)(2)(i) (2006).[5] A new

Certificate of Documentation ("CD") had recently been issued for the Twister, but Duckworth

had not yet received a physical copy of the new CD from the Coast Guard's National Vessel

Documentation Center. Defs.' Stmt. ¶ 3. Apparently anxious about missing the approaching

deadline, Duckworth went ahead and submitted his application package on April 24, 2006. *Id.*

¶ 4. Because he did not have the new CD for the Twister, Duckworth altered an electronic copy

of an old CD for the Twister to include the current information and submitted the altered CD

with his permit application. *Id.* ¶ 5. Specifically, Duckworth modified the CD to identify the

correct corporate owner, change the spelling of a street name, and change the date of issuance

and expiration date to reflect the information for the new CD. Pls.' Stmt. ¶ 10. Duckworth

obtained the current information by telephone from the National Vessel Documentation Center.

---

[4] The Court strictly adheres to the text of Local Civil Rule 7(h) (formerly Rule 56.1 when resolving motions for summary judgment). *See Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002) (finding district courts must invoke the local rule before applying it to the case). The Court has advised the parties that it strictly adheres to Rule 7(h) and has stated that it "assumes facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." [11] Order at 1 (July 29, 2009). Thus, in most instances the Court shall cite only to one party's Statement of Material Facts ("Stmt.") unless a statement is contradicted by the opposing party. The Court shall also cite directly to evidence in the record, where appropriate.

[5] The Court shall refer to the regulations in effect at the time of the alleged misconduct, i.e., April 2006 for the False Statement Case and August-October 2006 for the Lobster Traps Case.

*See* AR Ex. 81 (Admin. Hr'g Tr.) at 257.  Duckworth testified at the hearing that he submitted a cover letter along with his application describing the altered CD as a "simulated sample draft" of the new documentation.  Defs.' Stmt. ¶ 5; AR Ex. 85-H (Resp. Hr'g Ex. H).  One version of this cover letter was introduced into evidence at the hearing as Respondent's Exhibit H.  The document is unsigned and bears a date stamp reading "RECEIVED BY . . . PERMITS" with the date April 24, 2006, in the middle.  *See* AR Ex. 85-H.

Defendants received Duckworth's permit application on April 24, 2006.  Defs.' Stmt. ¶ 6. At the hearing, Ms. Pamela Thames, who initially reviewed Duckworth's application, and her supervisor, Mr. Ethan Hawes, both testified that when the permit office receives an application, it is immediately date-stamped, stapled together, placed in a processing bin, and remains intact (i.e., never separated) throughout the entire review process.  *Id.*  Ms. Thames and Mr. Hawes also testified that if an application is incomplete, the permit office makes a copy for its files, and then returns the original package in its entirety to the applicant.  *Id.*  Both Ms. Thames and Mr. Hawes testified that they did not see any cover letter in Duckworth's application package and stated that if such a letter existed, they would have kept a copy of it for their records pursuant to standard office procedure.  *Id.* ¶ 7.  Upon examining Duckworth's application, Ms. Thames noticed several oddities with the CD that was enclosed, such as an unusual font type and size and the processing initials "RAJ," which were the same initials included on a previous CD submitted for the Twister.  *See* AR Ex. 81 (Admin. Hr'g Tr.) at 195-96, 205-06, 301-05.  Ms. Thames brought the application to the attention of Mr. Hawes, and they called the Coast Guard to inquire about the CD and when it was issued.  *See id.* at 194-98.  The Coast Guard informed them that no such document with processing initials "RAJ" and an expiration date of April 30, 2007, existed.  *Id.* at

198.

Because Duckworth's application was incomplete, the NMFS permit office returned the entire package to him. Defs.' Stmt. ¶ 8. The permit office included a cover letter indicating that the CD did not appear to be a copy of the current documentation for the Twister. *See* AR Ex. 84-25 (4/27/2006 Letter from Northeast Permit Operations to Duckworth). At the hearing, Duckworth testified that he was not sure if his explanatory cover letter regarding the altered CD was returned to him with the rest of his application. *See* AR Ex. 81 (Admin. Hr'g Tr.) at 271. Duckworth telephoned Mr. Hawes a few days after receiving the returned application and informed him that he had received the new CD from the Coast Guard. *Id.* Duckworth then resubmitted his initial application with the new CD, which was received in the mail by the permit office and date-stamped on May 1, 2006, the deadline for submitting a renewal application. Defs.' Stmt. ¶ 8; 50 C.F.R. § 648.4(a)(1)(i)(B). NMFS deemed him to be in compliance and processed his permit application.

On May 11, 2006, Special Agents Todd Nickerson and Sean Eusebio from NOAA went to speak to Duckworth about his permit application. Defs.' Stmt. ¶ 9. The agents explained to Duckworth that the CD he originally submitted looked suspicious and asked him why the altered certificate was submitted. *Id.* Duckworth first replied that his stepdaughter was playing with the scanner and may have accidentally changed certain fields on the certificate. *Id.* ¶ 10. Duckworth further claimed he was not aware of the change and he did not know how the form was submitted with his initial application package. *Id.* Upon further questioning, Duckworth changed his explanation to state that while changes were made on a scanner by his stepdaughter, the changes were made at his direction. *Id.* ¶ 11. Duckworth also testified at the hearing that he sent a copy

of the explanatory cover letter he submitted with his initial application to Agent Nickerson after

their conversation. *Id.* ¶ 12; AR Ex. 85-I. A copy of this forwarded letter was introduced into

evidence at the hearing as Respondent's Exhibit I. The document is unsigned, bears no date

stamp, and contains a footer indicating that it was sent to Agent Nickerson by certified mail on

August 3, 2006. *See* AR Ex. 85-I.

     *B.*     *The Lobster Traps Case*

     In 2004, in an earlier enforcement case by Defendants, Duckworth was found liable for

unlawfully catching and possessing monkfish in federal waters and was assessed a monetary

penalty of $50,000. Defs.' Stmt. ¶ 14. Duckworth was required to pay the civil penalty on or

before August 1, 2006. *Id.* Duckworth was on notice that if the fine was not paid in full (or a

mutually acceptable settlement reached) by August 1, 2006, his operator and vessel permits

would be sanctioned and he would not be permitted to fish for federally regulated species. Defs.'

Stmt. ¶ 15. Duckworth was unable to reach a settlement or pay his fine by the August 1, 2006,

deadline, and the permit sanctions became effective on that date, leaving Duckworth and Plaintiff

F/V Reaper, Inc. without valid permits. *Id.* ¶¶ 17-18, 20.

     In late July, before the permits were sanctioned, Duckworth set approximately 800 lobster

traps in the Exclusive Economic Zone ("EEZ").[6] Defs.' Stmt. ¶ 16. Under federal fisheries

regulations, all vessels fishing for American lobsters in the EEZ must hold a valid permit. *Id.*

¶ 19. On August 7, 2006, Special Agents Troy Audyatis and Kevin Flanagan went to collect

Duckworth's fishing and operator permits, but he told them that he was too busy and would not

---

[6] The Exclusive Economic Zone extends 200 nautical miles seaward from the territorial
coast. *See* Proclamation No. 5030, 48 Fed. Reg. 10605 (Mar. 10, 1983).

talk to them. Defs.' Stmt. ¶ 22. Later that day, the agents learned from an informant that Duckworth was still fishing in the EEZ. *Id.* ¶ 23. At the hearing, Duckworth testified that he mailed Defendants a letter on August 7, 2006, giving Defendants notice that he had left 800 lobster traps deployed in the EEZ. *Id.* ¶ 21. A copy of this letter was introduced into evidence as Respondent's Exhibit M. *See* AR Ex. 85-M. The letter was not addressed to any particular individual or specific department or office, but rather to "NMFS." *Id.*

Between August 9, 2006, and August 24, 2006, the agents investigated further and conducted operations to locate, haul, and seize Duckworth's fixed gear deployed in the EEZ. Defs.' Stmt. ¶ 24. During this time, Defendants recovered 268 lobster traps with identification tags belonging to Duckworth. *Id.* Some of the recovered lobster traps were freshly baited and other traps contained approximately 270 live lobsters which were removed and returned to sea. *Id.* On August 22, 2006, the agents were finally able to meet with Duckworth and collect his vessel and operator permits. *Id.* ¶ 25. On October 2, 2006, the agents returned to Duckworth's home, informed him that they had received information that he had been fishing in the EEZ, and asked for his trap tags to account for his equipment. *Id.* ¶ 26. Duckworth then told the agents that he had 800 lobster traps deployed in the EEZ and further indicated that his brother, Eddy Duckworth, had conducted "buoy checks" on his gear to ensure that the traps were still set and in their present location. *Id.* The agents told Duckworth that Defendants had recently hauled and seized 268 of his traps and asked Duckworth to explain the presence of fresh bait. *Id.* Duckworth grew angry and demanded that the agents leave his property. *Id.*

On October 5, 2006, Special Agent Audyatis called Duckworth and again requested that he produce his lobster trap tags and inquired as to the location of the lobster traps. Defs.' Stmt.

¶ 27.  On October 12, 2006, Duckworth drove to Agent Audyatis's office and delivered the trap

tags.  *Id.* ¶ 28.  Duckworth agreed to help Defendants locate the lobster trap gear in the EEZ.  *Id.*

¶ 29.  On October 19, 2006, Defendants recovered several strings of lobster gear in the EEZ with

the help of Duckworth.  *Id.* ¶ 30.  On November 6, 2006, an additional string of traps was

recovered.  *Id.* ¶ 31.  Defendants recovered approximately 462 of the 800 lobster traps owned by

Duckworth.  *Id.* ¶ 32.

By November 15, 2006, Duckworth had paid the remainder of his $50,000 fine (with

interest) and was legally permitted to resume fishing in the EEZ.  *See* AR Ex. 81 (Admin. Hr'g

Tr.) at 367-68, 406, 408.

C.      *The ALJ's Decision*

Following a three-day hearing and extensive briefing from the parties, the ALJ issued an

Initial Decision and Order with findings of fact and conclusions of law.  The ALJ found that,

given the numerous discrepancies found in Duckworth's testimony at the hearing, his statements

regarding the explanatory cover letter allegedly sent with his permit application were not

credible.  *See* AR Ex. 58 (Initial Decision and Order) at 21.  Specifically, the ALJ found that

Duckworth's testimony that there were two versions of the cover letter, one with and one without

a date stamp from the permits office, was not credible.  *See id.*  The ALJ also discredited

Duckworth's testimony concerning the forwarding of the explanatory cover letter to Special

Agent Nickerson because it was allegedly sent on August 3, 2006, several months after their

initial conversation.  *See* Defs.' Stmt. ¶ 13.  Moreover, the ALJ deemed the testimony of the

permit office personnel regarding their handling of Duckworth's application and their office

procedures to be credible.  *See* AR Ex. 58 (Initial Decision and Order) at 21.  The ALJ found that

Duckworth had intentionally forged a document with his permit application, and the law required him to submit an authentic copy of the current Certificate of Documentation. *See id.* at 20. Accordingly, the ALJ concluded that NOAA established by a preponderance of the evidence that Duckworth and F/V Twister, Inc. submitted a false statement when they included an altered document in a permit application in violation of 50 C.F.R. §§ 648.14(a)(3), 648.4(c)(2)(i), and 648.14(a)(79).

The ALJ also deemed Duckworth's testimony regarding the August 7, 2006, letter informing Defendants of the lobster traps at sea to be not credible. *See* AR Ex. 58 (Initial Decision and Order) at 21. The ALJ noted that Duckworth had multiple direct contacts with NMFS agents and never asserted the existence of such a letter. *See id.* Moreover, the evidence produced by Duckworth at the hearing showed only that he had mailed some type of document to Defendants' general address on August 7, 2006. *See id.* at 39. An NMFS official testified that his office received several trip reports from Duckworth on August 7, 2006, but he did not recall ever seeing a copy of the alleged letter, which as a matter of policy, would have been forwarded to him for review. *See id.* The ALJ heard testimony regarding NOAA's document intake procedures, which he deemed credible. *See id.* at 39-40. The ALJ concluded that Duckworth's testimony that he mailed NMFS a letter regarding his 800 lobster traps on August 7, 2006, was not credible. *Id.* at 40. The ALJ further concluded that the manner in which Duckworth attempted to send it would render any such letter insufficient to constitute proper notice of the existence of traps in light of Duckworth's more direct involvement with enforcement agents and the NOAA General Counsel's Office during this time period. *See id*. at 40. Accordingly, the ALJ found that NOAA had established by a preponderance of the evidence that Duckworth and

F/V Reaper, Inc. unlawfully fished for lobster by leaving their traps in the EEZ without a valid permit in violation of 50 C.F.R. §§ 697.4(a), 697.5(a), and 697.7(c)(1)(xxvi).

The ALJ weighed the factors to be considered in deciding an appropriate penalty under the MSA and its regulations. *See* AR Ex. 58 (Initial Decision and Order) at 40-44. For the False Statement Case, the ALJ found the sanctions proposed by Defendants—a civil penalty of $130,000 and a revocation of operator and vessel permits for Duckworth and F/V Twister, Inc.—to be appropriate. *Id.* at 41. The ALJ deemed deliberate forgery of documentation to be a serious matter that undermined federal fisheries regulations and that harsh sanctions were necessary to deter unlawful conduct. *Id.* at 41-42. The ALJ also found Defendants' proposed sanctions for the Lobster Traps Case—a $910,000 civil penalty against Duckworth and F/V Reaper, Inc. and a revocation of operator and vessel permits—to be appropriate. *Id.* at 42. The ALJ found that Duckworth's conduct was deliberate and that Duckworth had a history of prior offenses that justified a severe sanction. *Id.* at 42-43. The ALJ also rejected Plaintiffs' argument that the sanctions should be reduced due to an inability to pay, finding that Duckworth had sold his fishing vessels to family members at substantial discounts, suggesting he was trying to shield his assets. *Id.* at 43-44.

D.    *Final Agency Decision*

Plaintiffs submitted a discretionary petition to the NOAA Administrator seeking review of the ALJ's decision. *See* AR Ex. 59 (Petition for Reconsideration). On April 1, 2009, the NOAA Administrator issued an Order granting in part and denying in part Plaintiffs' petition for review, asking the parties to address whether the fines and permit sanctions imposed by the ALJ were excessive and whether the ALJ adequately considered Plaintiffs' ability to pay the fines.

*See* AR Ex. 71 (4/1/2009 Order).  On November 24, 2009, NOAA Administrator Jane

Lubchenco issued an Order Modifying Initial Decision and Denying Motion to Stay ("final

decision").[7]  *See* AR Ex. 79 (Final Decision).  In the Order, the Administrator held that the fines

imposed by the ALJ did not violate the Eighth Amendment to the U.S. Constitution or the

Magnuson-Stevens Act or its regulations.  *See id.* at 4-8.  However, the Administrator concluded

that the ALJ had not given adequate consideration to Plaintiffs' ability to pay the fines.  *Id.* at 8-

9.  After considering Plaintiffs' ability to pay and the magnitude of the offenses, the

Administrator reduced the monetary penalty to $50,000 for the False Statement Case and

$50,000 for the Lobster Traps Case.  *Id.* at 9-10.  The Administrator also reduced the permit

revocations imposed by the ALJ to permit suspensions for a period of 48 months.  *Id.* at 9; AR

Ex. 80 (Correction to Order Modifying Initial Decision and Denying Motion to Stay).

## II.  LEGAL STANDARD

### A.  *Summary Judgment Under Federal Rule of Civil Procedure 56*

The parties have filed cross motions for summary judgment pursuant to Federal Rule of

Civil Procedure 56.  Summary judgment is proper when "the pleadings, the discovery [if any]

and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(c).  Under the summary judgment standard, the moving party bears the "initial responsibility

of informing the district court of the basis for its motion, and identifying those portions of the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

---

[7] Plaintiffs had filed a motion to stay the Administrator's decision until they could obtain responses to Freedom of Information Act requests that had been filed, but the Administrator denied Plaintiffs' motion.  *See* AR Ex. 79 (11/24/2009) at 3 n.1.

affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted).  All underlying facts and inferences are analyzed in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Where there are no disputed facts and review is based solely on the administrative record, summary judgment is appropriate for the party entitled to judgment as a matter of law.  *Young v. Gen. Servs. Admin.*, 99 F. Supp. 2d 59, 65 (D.D.C.), *aff'd*, 11 F. App'x 3 (D.C. Cir. 2000).

      B.      *Review of Agency Decisions Under the Magnuson-Stevens Act*

The standard of review for agency decisions under the Magnuson-Stevens Act is borrowed from the Administrative Procedure Act ("APA").  *See* 16 U.S.C. § 1858(b) ("The findings and order of the Secretary shall be aside by such court if they are not found to be supported by substantial evidence, as provided in section 706(2) of [the APA].")  The APA provides in pertinent part that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . unsupported by substantial evidence."  5 U.S.C. § 706(2).  The APA also provides that courts should set aside decisions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.*  The "substantial evidence" standard and the "arbitrary and capricious" standard "require equivalent levels of scrutiny."  *Mem'l Hosp./Adair County Health Ctr., Inc. v. Bowen*, 829 F.2d 111, 117 (D.C. Cir. 1987).  The Supreme Court has explained that "substantial evidence" means "more

than a mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The D.C. Circuit has recognized that, in applying the substantial evidence test, an agency decision "may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." *Morall v. Drug Enforcement Admin.*, 412 F.3d 165, 176 (D.C. Cir. 2005). Normally, a decision will be reversed for lack of substantial evidence "only when the record is so compelling that no reasonable factfinder could fail to find to the contrary." *Orion Reserves Ltd. P'ship v. Salazar*, 553 F.3d 697, 704 (D.C. Cir. 2009) (citation and quotation marks omitted). "[J]udicial review under the substantial evidence test is ultimately deferential." *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 705 (1980). The agency's decision is presumptively valid, and the court is not authorized to substitute its own judgment for that of the agency. *Id.* The Court's review is limited to the administrative record. *Bloch v. Powell*, 227 F. Supp. 2d 25, 30 (D.D.C. 2002).

In reviewing agency decisions, the court "must give substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994). The court's "task is not to decide which among several competing interpretations best serves the regulatory purpose." *Id.* Rather, the agency's interpretation is controlling "unless it is plainly erroneous or inconsistent with the regulation." *Id.* (citations omitted).

### III. DISCUSSION

Plaintiffs argue that the decision of the ALJ as modified by the NOAA Administrator should be reversed because the findings are not supported by substantial evidence and the

conclusions involve misapplications of the MSA and its regulations. Plaintiffs believe the ALJ erred with respect to both the False Statement Case and the Lobster Traps Case and argue that the penalties imposed by the NOAA Administrator are excessive. The Court shall evaluate each of these contentions.

A.      *The Magnuson-Stevens Act*

The Magnuson-Stevens Fishery Conservation and Management Act was enacted as a remedial effort to protect the nation's fisheries from overfishing. *See* 16 U.S.C. § 1801. The MSA directs the Secretary of Commerce to approve, implement, and enforce fishery management plans "to prevent overfishing, and to protect, restore, and promote the long-term health and stability" of American fisheries. *See id.* § 1853(a). To aid in the management of fishery resources, the MSA provides that it is unlawful for any person to violate any provision of the MSA or any regulation or permit issued pursuant to the MSA. *See id.* § 1857(1)(A). Any person who is found to have committed an act prohibited by the MSA may be held liable to the United States for a civil penalty. *Id.* § 1858(a). In determining the amount of a penalty, the Secretary must "take into account the nature, circumstances, extent, and gravity of the prohibited acts committed and, with respect to the violator, the degree of culpability, any history of prior offenses, and such other matters as justice may require." *Id.* In addition to civil penalties, the MSA provides that the Secretary may revoke any permit issued to a vessel or a person involved in a violation of the MSA. *Id.* § 1858(g).

The Secretary has promulgated regulations to implement the mandates of the MSA. Regulations codified at 50 C.F.R. Part 648 govern the fisheries of the Northeastern United States and impose general prohibitions and restrictions on all those who participate in the fishery. *See*

15

50 C.F.R. § 648.14.  Procedures for applying and obtaining a federal vessel permit are set forth in

50 C.F.R. § 648.4.  The regulations specify that, when applying for a federal vessel permit, an

applicant must provide, *inter alia*, "USCG documentation number and a copy of the vessel's

current USCG documentation."  50 C.F.R. § 648.4(c)(2)(i).  The regulations provide that it is

unlawful for a person to "[m]ake any false statement in connection with an application,

declaration, or report under [50 C.F.R. Part 648]."  50 C.F.R. § 648.14(3) (2006).[8]

The regulations codified at 50 C.F.R. Part 697 impose prohibitions and restrictions on all

those who participate in the American lobster fishery.  Specifically, the regulations provide that it

is unlawful for any vessel owner or operator to fish, possess, or land American lobster in the EEZ

without obtaining and carrying on board the vessel a valid federal limited access lobster permit

and a valid operator's permit.  *See* 50 C.F.R. §§ 697.4(a), 697.5(a).  The regulations also provide

that it is unlawful for any person owning or operating a vessel to "possess, deploy, fish with,

haul, harvest lobster from, or carry aboard a vessel any trap gear on a fishing trip in the EEZ from

a vessel any trap gear in or from the management areas . . . unless such fishing vessel has been

issued . . . a valid limited access American lobster permit . . . ."  *See id.* § 697.7(c)(1)(xxvi).

B.      *The False Statement Case*

Plaintiffs contend that the ALJ made four errors in its Initial Decision and Order finding

that Plaintiffs had violated MSA regulations by submitting an altered Certificate of

Documentation along with his permit application for the F/V Twister.[9]  First, Plaintiffs contend

---

[8] This language has since been recodified at 50 C.F.R. § 648.14(5).

[9] Plaintiffs also argue a fifth error with respect to the penalties imposed, which shall be discussed below with Plaintiffs' other arguments about penalties.

that the ALJ erred by failing to credit Duckworth's evidence that he had submitted a cover letter with his application explaining the altered CD. Second, Plaintiffs contend it was error not to accept as credible evidence the copy of that letter that was allegedly forwarded to Special Agent Nickerson. Third, Plaintiffs contend that it was error for the ALJ not to credit Duckworth's evidence that he had called the National Vessel Documentation Center to obtain information about the current documentation so as to ensure that the altered CD reflected accurate information. Fourth, Plaintiffs contend that it was error to find that Duckworth made a false statement because the corrections to the CD contained true information and Duckworth lacked an intent to deceive. The Court shall address each of these purported errors and determine whether the ALJ's decision is supported by substantial evidence.

      1.    <u>The Explanatory Cover Letters</u>

The first two alleged errors both pertain to Duckworth's explanation that he submitted an explanatory cover letter regarding the altered CD, which the ALJ found not credible. Plaintiffs argue that the date stamp on the first copy of the cover letter (introduced into evidence at the hearing as Exhibit H) proves that it was received by the NMFS permit office on April 24, 2006, the same day the rest of his permit application was received. *See* Pls.' Mem. at 11-13. Plaintiffs also argue that any irregularities in the processing of the mail should be construed in Plaintiffs' favor because Defendants had the burden of proof at the hearing. *Id.* at 13. With respect to the second copy of the cover letter (introduced into evidence at the hearing as Exhibit I), which was allegedly forwarded to Special Agent Nickerson in August 2006, Plaintiffs argue that the proof of delivery from the United States Postal Service established that this letter was delivered to Nickerson and it was error for the ALJ to conclude otherwise. *See id.* at 14-15. Plaintiffs invoke

the "common law mailbox rule," which states that proof that a letter has been properly addressed, stamped, and deposited in the mail gives rise to a rebuttable presumption that the letter was delivered in a timely fashion to its intended recipient. *See Legille v. Dann*, 544 F.2d 1, 4 (D.C. Cir. 1976).

Ultimately, the question is whether there was substantial evidence in the record to support the ALJ's conclusion that Duckworth's cover letter story was not credible. The ALJ heard testimony from officials in the NMFS permit office who received Duckworth's permit application but did not recall seeing any cover letter and who testified that all parts of a permit application remain together during processing, making it unlikely that a cover letter would be lost. Plaintiffs argue that the cover letter was likely received, date-stamped, and returned to Duckworth with the rest of his rejected application. *See* Pls.' Mem. at 13. However, Duckworth testified at the hearing that he could not recall if it was returned with his application package. *See* AR Ex. 81 (Admin. Hr'g Tr.) at 271. Moreover, even if the date-stamped cover letter was in fact received by the permit office and returned to Duckworth, he failed to explain at the hearing why the version he purportedly sent Special Agent Nickerson did not have a date stamp. As the ALJ wrote, "[i]f [Duckworth] sent Agent Nickerson the letter without a date stamp from the Agency because that was the only one he had at the time, why does he own two distinct versions now?" AR Ex. 58 at 35. The circumstances surrounding the second version of the letter are also suspect. The letter was purportedly forwarded to Agent Nickerson to prove that Duckworth had not been trying to mislead NMFS, yet it was not sent until nearly three months after Nickerson first contacted Duckworth. In addition, Duckworth purportedly sent the letter by certified mail to confirm that it was received by Nickerson, but the certified mail receipt indicates only that it was

sent on August 3, 2006, and delivered in New Bedford, MA on August 4, 2006. *See* AR Ex. 85-I. Duckworth could have obtained the recipient's signature from the U.S. Postal Service website, but he failed to do so before the hearing. *See* AR Ex. 58 at 33.

The evidence in the record is substantial enough to support the ALJ's conclusion that Duckworth's story about the cover letter was not credible. Although the date stamp on the first version of the unsigned cover letter strongly implies that it was in fact received at the NMFS permit office on April 24, 2006, the existence of the second version of the letter purportedly sent to Agent Nickerson, the testimony of the NMFS officials that no cover letter was received, and Duckworth's inability to explain how he obtained two versions of the cover letter significantly undermine the persuasiveness of that documentary evidence. Moreover, because the ALJ directly heard conflicting testimony in the record, he was in the best position to evaluate the credibility of the witnesses and make findings of fact. Accordingly, his findings are entitled to great deference. *See Nat'l Ass'n of Recycling Indus., Inc. v. Fed. Maritime Comm'n*, 658 F.2d 816, 824 (D.C. Cir. 1980) ("The importance of testimonial evidence and witness credibility to the factual findings in the instant litigation endow the ALJ's vision with particular acuity.") This Court sees no flaw in the logic of the ALJ's assessment in light of the evidence in the record.

The "common law mailbox rule" cited by Plaintiffs does not change the analysis. As an initial matter, that rule provides only a rebuttable presumption of delivery upon proof of mailing *and* the absence of evidence to the contrary. *See Legille*, 544 F.2d at 5-6. With respect to the cover letter accompanying the permit application, there was no proof that the cover letter was actually mailed and there was evidence in the record to suggest that in fact it was not received. With respect to the letter allegedly sent to Nickerson, there was some evidence suggesting that

the letter was sent by certified mail, but that evidence was discredited as insufficient. Even if the

letter to Agent Nickerson were presumed to have been received in August 2006, however, there

remain significant doubts as to whether that unsigned letter, with no date stamp, was a true copy

of the letter allegedly sent to the permit office in April 2006. Accordingly, the common law

mailbox rule does not eliminate the existence of substantial evidence in the record to support the

ALJ's conclusions.

Plaintiffs' third assertion of error is the ALJ's purported failure to credit a hearing exhibit

corroborating Duckworth's testimony that he made telephone calls to the National Vessel

Documentation Center to obtain current information about the Certificate of Documentation to

include in his permit application. *See* Pls.' Mem. at 16-17. The exhibit in question is a log of

telephone activity that was introduced as exhibit G at the hearing. *See* AR Ex. 85-G. However,

the ALJ's Initial Decision and Order does not specifically address exhibit G, and the ALJ did not

find that Duckworth's testimony was not credible on this subject, nor did he find that

Duckworth's alterations asserted false information. Rather, the ALJ's conclusion that a false

statement had been made was based on Duckworth's admission that he had altered the CD and

the factual finding that Duckworth had not notified Defendants of the alterations when the permit

application was submitted. Therefore, Plaintiffs' third asserted basis for error is without merit.

2. Alleged Lack of a "False Statement"

Plaintiffs argue that the ALJ erred in finding that Duckworth and F/V Twister, Inc. made

a "false statement" under the MSA regulations because the information that was altered on the

Certificate of Documentation was not false and it was not submitted with an intent to deceive.

As explained above, however, the ALJ's decision was not dependent on the falsity of the

alterations to the CD.  Rather, the ALJ found that the MSA regulations required Plaintiffs to submit a copy of the current USCG documentation for the vessel, and Plaintiffs made a false statement by passing off an altered Certificate of Documentation as a true copy.  Thus, the question is whether the ALJ has properly interpreted the MSA regulations.

The MSA regulations provide that it is unlawful to "[m]ake a false statement in connection with an application, declaration, or report under [50 C.F.R. Part 648]."  50 C.F.R. § 648.14(a)(3) (2006).  In applying for a vessel permit, a party must provide certain information, including "USCG documentation number and a copy of the vessel's current USCG documentation."  50 C.F.R. § 648.4(c)(2)(i).  In accordance with the regulations, NMFS requires that permit applicants provide a current copy of a vessel's valid USCG documentation.  By signing a permit application, an applicant agrees to "affirm, subject to the penalties provided in 18 USC 1001, that all information I have given in obtaining this permit is true and correct."  *See* AR Ex. 84-25 (Initial Permit Application) at 5.  Below the signature line on the application is a statement that reads "You must complete and sign the application and include a copy of vessel's valid registration or USCG Documentation."  *Id.*  At the bottom of the newly-issued CD that was eventually sent to NMFS, it reads, "Previous Edition Obsolete.  This Certificate May Not Be Altered."  *See* AR Ex. 84-26 (Certificate of Documentation).  Based on the foregoing, the ALJ concluded that in signing the permit application with the altered CD enclosed, Plaintiffs falsely stated to NMFS that the document was a valid copy of the USCG CD for the F/V Twister.  As the ALJ explained, "[t]he document was not a copy of anything, let alone a copy of his official certificate of documentation."  AR Ex. 58 (Initial Decision and Order) at 31.  Moreover, the ALJ found that Duckworth included the document in the package intentionally for the specific

purpose of obtaining a permit, and therefore his actions were intentionally designed to deceive NMFS. *See id.*

The Court finds no fault with the ALJ's findings with respect to the false statement claim. Duckworth does not dispute that he altered an official USCG Certificate of Documentation and submitted it to NMFS for the purpose of renewing the permit for the F/V Twister. The fact that he altered it in a way that reflected current information does not change the fact that he attempted to pass off an altered document as a copy of the current documentation, which it was not. Therefore, there was substantial evidence to support the ALJ's finding that a false statement was made in applying for a permit in violation of MSA regulations.

Plaintiffs next argue that the inclusion of truthful information shows there was no intent to deceive, which they claim is a required element of the offense of making a false statement. However, the ALJ did find that there was intent to deceive. He rejected Duckworth's claims that he sent a cover letter explaining his changes, which is the primary basis for Plaintiffs' argument. Moreover, NMFS requires permit applicants to provide a valid copy of the vessel's documentation regardless of whether the information could be provided by other means, such as a letter from the applicant. Therefore, it was reasonable for the ALJ to conclude that Duckworth intended to deceive the NMFS by altering the CD rather than simply providing the current information by letter. In addition, Defendants cite case law indicating that state of mind need not be proven to enforce civil penalties under the MSA. *See, e.g.*, *Northern Wind, Inc. v. Daley*, 200 F.3d 13, 19 (1st Cir. 1999) (explaining that offenses under the MSA are strict liability and thus scienter is not a required element). Plaintiffs cite *Lobsters, Inc. v. Evans*, 346 F. Supp. 2d 340 (D. Mass. 2004), for the proposition that intent to deceive is a required element of the offense of

making a false statement. However, the *Lobsters, Inc.* court did not decide whether scienter is a required element because it found that the statement at issue was not false. *See* 346 F. Supp. 2d at 347. Therefore, the Court finds that the ALJ did not err in concluding that Plaintiffs made a false statement in violation of the MSA regulations.

C.      *The Lobster Traps Case*

Plaintiffs make several arguments regarding alleged errors by the ALJ in determining that Plaintiffs unlawfully fished for lobster by leaving their traps at sea after their permits were sanctioned. Plaintiffs' primary argument is that leaving their traps within the EEZ without further activity does not constitute "fishing" within the meaning of the MSA or its regulations. Plaintiffs also argue that the ALJ erred by discrediting the evidence suggesting that Duckworth mailed a letter to NMFS in August 2006 regarding the outstanding traps. Finally, Plaintiffs argue that the ALJ erred by failing to permit cross-examination regarding the information given by informants about Plaintiffs' fishing.[10] The Court shall address each of these contentions.

1.      "Fishing" for Lobster

Plaintiffs argue that they did not violate any federal regulations by fishing without a license because they set their lobster traps at sea while their permits were valid and did not engage in further fishing activity after their permits were revoked. However, under MSA and its regulations, "fishing" is not limited to the actual catching, taking, or harvesting of fish. Specifically, "fishing" is defined in the statute as:

(A) the catching, taking, or harvesting of fish;
(B) the attempted catching, taking, or harvesting of fish;

---

[10] Plaintiffs also assert various claims of error with respect to the assessment of penalties, which shall be addressed below.

(C) any other activity which can reasonably be expected to result in the catching, taking, or harvesting of fish; or

(D) any operations at sea in support of, or in preparation for, any activity described in subparagraphs (A) through (C).

16 U.S.C. § 1802(16); *see also* 50 C.F.R. § 600.10 (applying same definition for regulations).

Lobsters are included within the definition of "fish" under the MSA. *See* 16 U.S.C. § 1802(12) ("The term 'fish' means finfish, mollusks, crustaceans, and all other forms of marine animal and plant life other than marine mammals and birds.")

The ALJ concluded that Plaintiffs were "fishing" within the meaning of the MSA's regulations by leaving their lobster traps in the EEZ at a time when they did not possess valid permits.[11] The ALJ noted that fixed gear such as lobster traps are specifically designed to be left at sea and checked periodically to collect any catch. *See* AR Ex. 58 at 37. The ALJ further explained that even without live bait, lobster traps continue to catch lobster unless wired shut or otherwise rendered inoperable. *See id.* In this case, several hundred live lobsters were found inside Plaintiffs' traps throughout Defendants' recovery operations. In addition, Duckworth testified at the hearing that on a couple of occasions, he had his brother conduct buoy checks on Plaintiffs' gear. *See* AR Ex. 82 (Admin. Hr'g Tr.) at 547. The ALJ found that this maintenance of traps in the form of buoy checks was an operation at sea both in support of and in preparation of fishing activity. AR Ex. 58 at 37. The ALJ also concluded that Plaintiffs were not legally permitted to leave their lobster traps at sea once the permit sanction took effect. *Id.* at 38. The

---

[11] Plaintiffs suggest in their brief that the ALJ's conclusion that there was unlawful fishing was based on the *hauling* of traps conducted by enforcement officials. *See* Pls.' Mem. at 26. However, that is clearly not the basis for the ALJ's conclusions. It is true that Plaintiffs were charged with seven counts, one for each set of traps that were hauled by NMFS enforcement officials. But the ALJ concluded that the violation was not the hauling of the traps, but rather their existence in the water after permit sanctions became effective.

ALJ found that Plaintiffs had advance notice that their permits would be suspended August 1, 2006, and they had ample time to haul the traps before that date. *Id.* Thus, the ALJ concluded that Plaintiffs should have removed their traps before August 1, 2006, or in the alternative, provided notice of the outstanding traps to NMFS. *Id.*

The ALJ's interpretation of the MSA regulations is a reasonable one. If Plaintiffs were allowed to leave their lobster traps at sea while their permits were sanctioned, nothing would prevent them from hauling the traps and harvesting lobsters the first day their permits became valid again, in this case, on November 15, 2006 (assuming there are no seasonal or other restrictions). Such an outcome would significantly undermine the effectiveness of the Magnuson-Stevens Act's regulatory regime. The ALJ's conclusion is also consistent with prior administrative case law treating unattended or lost traps as fishing and resulting in harm to the fishery. *See, e.g.*, *In re Etchells*, 6 O.R.W. 219, 1990 WL 322720 (N.O.A.A. Oct. 30, 1990) (finding violation for failure to submit lost trap report). Plaintiffs argue that this definition of fishing is inconsistent with instructions provided by NMFS to fishermen regarding the completion of fishing vessel trip reports ("FVTRs"). *See* Pls.' Mem. at 26-27; AR Ex. 85-B ("Fishing Vessel Trip Report" Reporting Instructions). Those instructions indicate that "FVTRs do not have to be completed if the vessel only sets gear [or] returned to port prior to engaging in any fishing activity." AR Ex. 85-B at 3. Plaintiffs interpret this sentence as meaning that setting gear does not constitute fishing activity for purposes of MSA enforcement. However, the FVTR instructions do not purport to define "fishing" for purposes of the MSA or its regulations; rather, they are written for the purpose of aiding fishermen in completing their FVTRs. This informal agency guidance document does not supersede the definition of "fishing" that is clearly stated in

the statutes and regulations themselves.  Accordingly, the Court finds no error in the agency's interpretation of the unlawful fishing regulations as applying to Plaintiffs' traps, and there was substantial evidence to support the ALJ's finding that there was fishing activity.

## 2.    Plaintiffs' Letter to NMFS Providing Notice of the 800 Lobster Traps

Plaintiffs argue that the ALJ erred by discrediting the evidence that Duckworth sent a notice letter to NMFS in early August 2006 indicating that he had 800 lobster traps in the EEZ. Plaintiffs contend that the letter should have been presumed delivered to NMFS because it bears a delivery confirmation from the U.S. Postal Service.  *See* AR Ex. 85-M at 3.  However, the document shows only that some type of document was delivered to NMFS at One Blackburn Drive, Goucester, MA on August 7, 2006.  *See id.*  At the hearing, an NMFS official, Barry Clifford, testified that correspondence received with trip reports would be sent to him for review, and Mr. Clifford testified that he never saw a notice letter from Duckworth and that he likely would have remembered it if he had.  *See* AR Ex. 83 (Admin. Hr'g Tr.) at 564-70.  The ALJ credited Mr. Clifford's testimony as more credible than Duckworth's.  The ALJ also found it suspicious that Duckworth never mentioned the outstanding traps to the NMFS officials with whom he was negotiating regarding his permit sanctions, but instead sent a letter that was neither addressed to any particular individual or a specific NMFS department or office.  *See* AR Ex. 58 at 38-39.  Duckworth also did not mention the traps to the NMFS agents who contacted him after the permit sanctions went into effect until they confronted him with evidence that he was still fishing in the EEZ.

As explained above, the ALJ is in the best position to observe the demeanor of the witnesses and to evaluate the credibility of conflicting witness testimony and any inconsistencies.

His findings in that regard are subject to a heightened degree of deference. The circumstances surrounding Duckworth's purported notice letter and the testimony from Mr. Clifford provide substantial evidence to support the ALJ's conclusion that adequate notice was not given to cure Plaintiffs' fishing for lobsters without a permit.

On a related note, Plaintiffs argue that Defendants should not be permitted to sanction them because NMFS failed to take steps to mitigate the harms when they were notified, first by Duckworth and second by an informant, that Plaintiffs' lobster traps were left at sea. *See* Pls.' Mem. at 29-30. However, civil enforcement actions under the Magnuson-Stevens Act are not like tort claims where damages must be proven. The MSA imposes obligations on fishermen to retrieve their fishing gear; it does not impose a tort-like duty on NMFS to mitigate the harms caused by violators so as to minimize possible sanctions against them. Thus, the fact that NMFS might have been able to act more quickly—at its own expense—to retrieve Plaintiffs' lobster traps does not have any bearing on whether Plaintiffs violated federal regulations. To the extent this may be considered at all, it is only relevant to the assessment of penalties and sanctions.

3.     Use of a Secret Informant

Plaintiffs claim that the ALJ erred when he failed to allow Plaintiffs' counsel to cross-examine Special Agents Audyatis and Flanagan about information provided by informants regarding Plaintiffs' lobster traps. The record shows that the ALJ limited the questioning of these witnesses so as to avoid revealing the identity of the informants. *See* AR Ex. 82 (Admin. Hr'g Tr.) at 439-41. Plaintiffs thus claim they were unable to ask questions regarding the identity of the informant and how the informant came across information that Plaintiffs had fishing gear at sea. However, Plaintiffs have not shown that this "error" was prejudicial. The ALJ's decision

does not explicitly rely on the existence of information provided by an informant, as there was testimony from the agents as to what they observed as well as Plaintiffs' own admissions. At most, the informants prompted the agents to investigate the alleged violations. Therefore, Plaintiffs have failed to explain how this information would be relevant to the ALJ's evaluation of the facts. Moreover, the ALJ has discretion to limit the testimony received at an administrative hearing, and Plaintiffs have not shown that the ALJ abused that discretion. Accordingly, this claim of error has no merit.

### D. Penalties

Plaintiffs complain that the penalties assessed by the ALJ and the NOAA Administrator are excessive and in violation of the MSA, its regulations, and the Eighth Amendment to the Constitution. Specifically, Plaintiffs argue that the penalties were not assessed in accordance with NOAA's penalty schedule guidelines, are grossly disproportionate given the nature of the violations, and do not adequately take into account Plaintiffs' ability to pay. The MSA provides that in assessing penalties, "the Secretary shall take into account the circumstances, extent, and gravity of the prohibited acts committed and, with respect to the violator, the degree of culpability, any history of prior offenses, and such other matters as justice may require." 16 U.S.C. § 1858(a). The MSA also authorizes the Secretary to consider evidence of ability to pay. *Id.*

Plaintiffs argue that the fines imposed are excessive in violation of the Eighth Amendment's Excessive Fines Clause, citing *United States v. Hosep Krikor Bajakajian*, 524 U.S. 321 (1998). In *Bajakajian*, the Supreme Court held that a punitive fine violates the Excessive Fines Clause if it is grossly disproportional to the gravity of the offense that it is designed to

punish. 524 U.S. at 332. Plaintiffs argue that the $100,000 total fine is excessive in light of the fact that Duckworth's false statement involved only truthful information and that Duckworth did not harvest or take lobsters from the sea without a permit. Plaintiffs also argue that the penalty is excessive because Duckworth will be deprived of his livelihood if his permits are suspended. However, ability to pay is not a component of the Eighth Amendment proportionality analysis. *See United States v. Emerson*, 107 F.3d 77, 81 (1st Cir. 1997) ("[T]he 'touchstone' is the value of the fine in relation to the particular offense, not the defendant's means.") Moreover, the fines imposed are well within the range allowed by the Magnuson-Stevens Act. *See* 16 U.S.C. § 1858(a) (providing for civil penalties up to $130,000 for each violation, with each day of a continuing violation constituting a separate offense).[12] The Supreme Court has explained that the "judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Bajakajian*, 524 U.S. at 336.

Both the ALJ and the NOAA Administrator enumerated reasons why the record supports a substantial fine. Duckworth intentionally forged official U.S. Coast Guard documentation for the purpose of obtaining a permit renewal. This is a serious offense that must be deterred in order to preserve the integrity of the MSA regulatory regime. The ALJ also found that the preponderance of reliable evidence showed that Plaintiffs intentionally tried to circumvent the law by deploying lobster gear in federally regulated waters while permit sanctions went into effect. The NOAA Administrator found that Duckworth's action in these cases, combined with his record of three prior offenses which incurred increasingly severe penalties, demonstrates a

---

[12] The original statutory maximum was $100,000 per violation, but it was raised to $130,000 pursuant to the Debt Collection Improvement Act. *See* 69 Fed. Reg. 74416 (Dec. 14, 2004).

"cavalier attitude toward the agency's regulations and enforcement processes." AR Ex. 79 at 6. Accordingly, the Administrator found that the substantial penalties proposed by Defendants were warranted. The Court agrees with the Administrator's and the ALJ's assessment of penalties and sanctions and finds that a $100,000 fine is not grossly disproportionate to the gravity of the offenses. Indeed, the fine imposed for each case is $50,000, the same amount as Duckworth's most recent prior violation. Therefore, Plaintiffs' Eighth Amendment challenge must fail.[13]

Plaintiffs also argue that the ALJ and the Administrator erred by failing to follow the NOAA's Penalty Schedule, which is "a compilation of internal guidelines used by NOAA enforcement attorneys in assessing penalties for violations of statutes and regulations that NOAA enforces." *See* AR Ex. 84-6(d) (Penalty Schedule) at i. The guidelines call for the weighing of fourteen aggravating or mitigating factors in assessing penalties, such as the gravity of the violation, the harm to the resource, whether there are multiple violations, the degree of cooperation, acceptance of responsibility, history of past offenses, and deterrence of future violations. *See id.* at ii-iii. The aim of these guidelines is to promote uniformity in penalties assessed for similar violations nationwide. However, they are not binding on ALJs, and therefore Defendants have no obligation to justify any departures from them. *See Pharaon v. Bd. of Governors of Fed. Reserve System*, 135 F.3d 148, 156 (D.C. Cir. 1998) (rejecting claim that agency's failure to follow advisory guidelines rendered action arbitrary and capricious). Moreover, although the ALJ and the NOAA Administrator did not explicitly mention the Penalty

---

[13] Plaintiffs also cite *Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605 (2008), for the proposition that a 1:1 ratio of punitive to compensatory damages is appropriate in maritime cases. *See* 128 S. Ct. at 2633. However, *Exxon Shipping* involved punitive damages under the federal maritime law, not civil enforcement penalties, and has no applicability here.

Schedule in their decisions, their analyses show that they did consider many of the factors enumerated in the guidelines.

Plaintiffs also argue that the 4-year permit suspensions and the $100,000 fine will have a significant impact on Duckworth's livelihood and that the Administrator failed to completely take into account Duckworth's ability to pay. *See* Pls.' Mem. at 37. However, the NOAA Administrator clearly gave detailed consideration to Duckworth's ability to pay and reduced the total fine from over $1 million to $100,000. Duckworth submitted financial information to the Administrator showing that he had current assets of $343,914 and current liabilities of $331,913 and expected to earn $40,800 in 2008 with annual living expenses of $49,076. *See* AR Ex. 79 (Final Decision) at 8. While these figures suggest that paying a $100,000 fine will be burdensome, Defendants are not required to impose penalties that can be easily paid out of pocket. The Court also notes that Duckworth was able to pay the $50,000 fine that was imposed for a prior violation. The Administrator concluded, based on all the evidence in the record, that $100,000 as a total fine was justified and appropriate. Plaintiffs have not shown that the Administrator's assessment of penalties is arbitrary, capricious, or unsupported by substantial evidence.[14]

In their reply brief, Plaintiffs attach a report from the Department of Commerce's Office of Inspector General ("OIG") reviewing NOAA's enforcement of fisheries regulations. *See* Pls.'

---

[14] Plaintiffs also argue that the 48-month permit suspensions for Plaintiffs' three fishing vessels, which have since been sold to Duckworth's relatives, "imposes penalties on individuals that had no part in the offenses and have not had their day in court." Pls.' Reply at 9. However, the current owners of the vessels are not parties to this action, and the MSA clearly states that transfer of ownership of a vessel does not extinguish any permit sanctions in effect or pending at the time of transfer. *See* 16 U.S.C. § 1858(g)(3).

Reply, Ex. P-1 (OIG Report). The OIG Report involved a review of the agency's enforcement operations from June through December 2009. *See id.* at 1. The OIG Report concludes that NOAA needs to strengthen its control over enforcement operations to address an industry perception that its civil penalty assessment process is arbitrary and unfair. *See id.* at 3. The OIG Report also makes a number of other recommendations to address problems it identified with the enforcement of fisheries violations. Plaintiffs argue that the OIG Report shows that Defendants' assessment of penalties are excessive, citing language from the Report showing that aggregate fine assessments in the Northeast region are inconsistent with other regions. *See* Pls.' Reply at 10 (citing OIG Report at 13). However, the OIG Report focuses only on the agency's overall management of enforcement operations, not on individual allegations of mistreatment. Moreover, the OIG's investigation was limited to June-December 2009, several years after Plaintiffs were charged with the violations at issue and after the ALJ's Initial Decision and Order was issued. Therefore, the OIG Report provides no information directly relevant to Plaintiffs' case.

In addition, Defendants point out that the OIG Report is extra-record evidence that should not be considered in a review of agency decision-making. *See IMS, P.C. v. Alvarez*, 129 F.3d 618, 623 (D.C. Cir. 1997) ("It is a widely accepted principle of administrative law that the courts base their review of an agency's actions on the materials that were before the agency at the time its decision was made.") Exceptions to this principle may be made in limited circumstances where an agency fails to explain its actions so as to frustrate judicial review or there is a "strong showing of bad faith or improper behavior" that justifies further explanations. *Id.* at 624 (citing *Camp v. Pitts*, 411 U.S. 138, 142-43 (1973) (per curiam) and *Citizens to Preserve Overton Park*

*v. Volpe*, 401 U.S. 402, 420 (1971)).  However, Plaintiffs have not shown that the agency acted

in bad faith or that the administrative record does not fully reflect the agency's decision-making

process.  Accordingly, the Court shall disregard the OIG Report as presenting evidence outside

the record.

   E.  *Temporary Restraining Order & Preliminary Injunction*

   Shortly after the agency issued its final decision, Plaintiffs filed a Motion for a Temporary

Restraining Order and Preliminary Injunction seeking to enjoin Defendants from enforcing the

permit sanctions and civil penalties assessed for Plaintiffs' violation of fisheries regulations.

After this Court explained to the parties that preliminary injunctions are generally not appropriate

when a party seeks review of agency action under the APA and that decisions on the merits are

preferable, *see Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 & n.7 (D.C. Cir. 2001),

Defendants agreed to stay enforcement of the civil penalties and permit sanctions through April

15, 2010, and Plaintiffs agreed to withdraw their motion for emergency relief.  The parties filed

their briefs on an expedited schedule so as to enable the Court to rule on the merits by the April

15, 2010, deadline.

   On April 7, 2010, Plaintiffs filed a second Motion for a Temporary Restraining Order and

Preliminary Injunction Seeking to Stay Judicial Decision-Making and to Stay Enforcement

Proceedings.  As grounds for their motion, Plaintiffs allege that OIG is currently investigating

three federal employees who were involved in the prosecution of Plaintiffs' case, and OIG

officials have been in contact with Duckworth regarding the circumstances surrounding this

enforcement matter.  *See* Pls.' Mot. for TRO & Prelim. Inj. at 1-2.  The OIG's investigation is

alleged to be a follow-up to the OIG Report that Plaintiffs attached to their reply brief.  In

response to Plaintiffs' motion, Defendants have produced a declaration from Scott Berenberg, Assistant Inspector General for Investigations at OIG. *See* Defs.' Opp'n to Pls.' Mot. for TRO & Prelim. Inj., Decl. of S. Berenberg. Mr. Berenberg declares that he oversaw the OIG's investigation into the agency's enforcement operations and that he is familiar with Duckworth's case. *See id.* ¶¶ 4-6. Mr. Berenberg explained that while OIG is conducting a review of some specific cases, Duckworth's case is not part of the ongoing investigation by OIG. *Id.* ¶ 8. Plaintiffs argue that Duckworth's case may become part of the investigation in the future.

The Court finds that there is presently no investigation by the OIG into the circumstances directly relevant to Duckworth's case. It is purely speculative to assume that the OIG will uncover evidence of bad faith or improper conduct by Defendants regarding the handling of Plaintiffs' violations. Moreover, Plaintiffs have failed to allege that documents are missing from the administrative record in this case or that the record does not reflect the entire basis for the agency's decision-making. Therefore, the OIG's ongoing investigation has no bearing on the appeal presently before the Court.

It is well established that to prevail on a motion for a temporary restraining order or a preliminary injunction, the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006); *Hall v. Daschle*, 599 F. Supp. 2d 1, 6 n.2 (D.D.C. 2009) ("[t]he same standard applies to both temporary restraining orders and to preliminary injunctions"). As explained above in this Memorandum Opinion, the Court has conducted a full review of the

merits and determined that Plaintiffs are not entitled to the relief requested.  Accordingly,

Plaintiffs cannot meet the first prong required for injunctive relief, and the Court shall DENY

Plaintiffs' motion for a temporary restraining order and preliminary injunction.

## IV.  CONCLUSION

For the foregoing reasons, the Court shall GRANT Defendants' [24] Motion for

Summary Judgment, DENY Plaintiffs' [22] Motion for Summary Judgment, and DENY

Plaintiffs' [28] Motion for a Temporary Restraining Order and Preliminary Injunction.  An

appropriate Order accompanies this Memorandum Opinion.


Date:   April 15, 2010


_____*/s/*_____
COLLEEN KOLLAR-KOTELLY
United States District Judge